Thank you, Your Honor. My name is Michael Ponto and I'm here on behalf of Kastler Smoke Shop. Please let me know if you can't have any trouble with the audio. I'm on the phone today and I'd like to also reserve a minute for a rebuttal today. The issue we're appealing is the issue of whether or not the court improperly usurped the role of the jury by granting summary judgment and not allowing the tort of bad faith to go to the jury. In Arizona, we found that the issue of fair debility on insurance claim is just not sufficient to avoid a bad faith claim and it takes more. And so in this case here, the court should have followed the rule that the appropriate inquiry is whether or not there was sufficient evidence from which reasonable jurors, in this case, could have concluded the investigation, evaluation, or the processing of the claim by Atlantic was proper that they acted reasonably and either knew or were consciously aware of the fact that it wasn't reasonable. Council, may I interrupt? I fully appreciate the standard in Arizona, which you've laid out clearly in your brief. You have a half a dozen different points, but you think I think amount of evidence from which a reasonable juror could have found that standard met. Can you tell me what do you think is the strongest evidence of bad faith that should have been allowed to go to the jury? I think the lack of a follow-on investigation. Once you had competing views on the level of damage, Your Honor, we had Brown O'Haver who came in and had damages in the area of $200,000, whereas the Atlantic was tying themselves to the resolution at $15,000. It was incumbent on the insurance company to go back and say, hey, we have these two disparate views. We should do a further investigation. They didn't do a further investigation. I think secondly to that is whether or not you gave equal consideration. When we have situations like this, the insurance world, we quite often have vendors whose livelihood is completely tied to the goodwill of the insurance companies. And we always have these conflicts, just in this case here, where you have a vendor who comes up with a level of information that the client disagrees with. That forced them to go to Brown O'Haver and get a different opinion. So once we have this conflict of arguments as to the value of the property, what's salvageable, what's non-salvageable, and why Atlantic decided to go to the client. So counsel, your view is that the company provided a choice of appraisers. The insured picked one. The appraiser came out with a value. The insured disputed it. That in every circumstance, in order to avoid a bad faith claim, the insurer must conduct a substantial subsequent investigation beyond reading the appraiser's report and deciding that it's objectively reasonable? What I would say, your honor, is that in a situation like this, where you have two disparate points of view on it, that the insurance company cannot just simply select the point of view that aligns with their interests. So whether they agree with resolution or they disagreed and brought in the second person, the guardian said, you know, and the question gets down to the reasonableness. So when they're looking at this claim and they have two different opinions, what's the reasonable thing to do? Would it be reasonable? And that is a question that should have gone to the jury. And the jury should have decided whether or not they thought they acted reasonably by aligning with one of the entities that actually the agent of the insurance company recommended. We have to remember that these parties, CASPER, these are not autisticated individuals. They have a fire. They don't know who to go to for radiation. They don't know who to consult with. They rely heavily on the insurance companies. The insurance company will come back and tell you people that they've worked with and then they go select it. It's when they have a conflict and they disagree with the findings of that individual, the insurance company needs to do more. It can't just simply say, aha, I have something that aligns with my interests and based on that, I'm going to go off and deny the claim. I'm not going to move forward on it. So in my opinion, I think based on the circumstances, when you have this conflict of interest, the insurance company has to do more than simply say I found somebody that aligns with me. That makes it fairly debatable. Thus, I don't get the bad faith. Our Supreme Court disagrees with that. It takes more than just finding the ability to rely on one vendor. Was that reasonable? Could I ask a question about that? Is it the BOH evaluation that you think raised this need for a tie-breaking evaluation? Well, I think two things. I think, first of all, the client disputing in the first place and I think the BOH evaluation and the other side of the BOH evaluation is, as the court knows, this did go to trial and the jury did find that the number, you know, they found a number of $94,000 of additional damages above and beyond the damages the Atlantic found. Well, we know that now. We know that now. But if you could focus on what was before the district court, right, at the time. I'm concerned if I could just get you to go back to BOH because it seems to me that's what's triggering your argument. And my understanding from the record is that BOH didn't do an independent evaluation. Do I have that wrong? I don't, the BOH did not do it. I don't know the extent of independent evaluation that BOH did. BOH is a public adjuster, your honor. And didn't BOH simply pick the retail value or pick the value for the DVDs that was simply given them by the owner without doing any independent investigation at all to determine if that number was right or wrong? Yes, they chose the number. But again, we have to look at the situation here. I'm sorry, they chose the number given by the insured? By the insured or the insured representative, Mr. Stage. And the issue we have to understand here, your honor, is this is kind of a unique little convenience store. They're a local convenience store. They're not like a Circle K. They're, you know, they have everything from, I'm sorry to say, porn DVDs, the hookah pipes, the things that serve that market. So they did go to the insured representative, find out what the value of that was. And, you know, BOH did rely on that value. But again, the owner. And later, if I'm reading his deposition correctly, the owner specifically testified that basically, yeah, I just, this isn't actually the value that I mark them up three times what I paid for them. And that's the number I gave BOH. Do I have that right? Yes. That was before the district court at the time it ruled that there was no evidence from which a jury could find that it was unreasonable not to credit that evaluation, which involved no investigation into the value. Well, you're talking about the DVDs in that case. And it is in the fact that he bought the DVDs, he bought them for a price and he marks them up. This is a client who would buy, go to Los Angeles and buy off the street a lot of their products. So what they bought them for and what they marked them up for and what they would sell them for is something that the owner can testify to, as well as the owner's representative, which is safe. And what, and again, what value was the insurance company required to pay off on? Was it retail value or was it something else? It would be retail value, your honor. This is important. I thought it was a replacement value of the inventory. Forgive me for interrupting Judge Bennett. No, that was my question. Oh, I should have let you ask it. My apologies. No, no, no. When you look at the breach of contract and you look at the bad faith plan, you're going to have two different types of damages. Okay. The replacement value would be under the breach of contract. So in other words, that is the lost profit that this store had by losing all that inventory. But the fact is, is that the DVDs are only a portion of the BOH number. And I know the court is talking about whether or not it was reasonable, but we do have a jury that found that those calculations were correct, more so than the calculations provided by the insurance company by resolution. And the other issue gets down to not only just the value of it, well, what was salvageable and what was not salvageable? So it's not just a difference of the price. It's the difference of what could be salvaged and what could not be salvaged. And the position that we had was the vast majority of the items, both retail items and business personal property, were not salvageable items at all. That's evidence, counsel. That's evidence that you presented before the jury. It looks like you presented it successfully. But to be candid, I want to give you a chance to respond. It struck me that earlier, there was a different record before the district court. Well, the record before the district court did include Mr. Deluise's testimony that the product was not, that he smelled smoke and it wasn't salvageable. So we had that before the court. The issue then is, you know, the dispute in this case has always been, you know, what's salvageable, what's not salvageable, and then what's the value of all of it? Right. And so since your time is ticking, forgive me, but your time really is running down. And so this is why I asked you initially, I want to make sure I've got it. What's your strongest evidence of bad faith that you think should have been allowed to go to the jury? And I think you told me it was the failure to do the subsequent investigation once your client objected. Is there more? Yes. Is there more? Oh, I'm sorry. I thought you wanted to go back to that one point. No, I'm trying to get your best answer about what you think, why you think the district court erred by dismissing the bad faith. I think the district court erred because the district court made judgments that the jury should have been allowed to make. The district court should have been able to evaluate the testimony of the Brown O'Haver people. The district court should have been allowed, the jury should have been allowed to evaluate the testimony of the others and decide who was being reasonable and how they did it. You know, the other side of the Atlantic is fully able to examine them on any other of the issues on virus credibility. And as I said before, what we do know is when that happened, we have a record that shows a reasonable jury did that. So my point is, is that the court usurped that. But I mean, counsel in Arizona, like most jurisdictions, have to show a lot more to prevail on a faith claim than you do on a breach of equals bad faith. You need objectively unreasonable conduct, not just that you're wrong. Right. But that's really a decision for the jury to make. And the jury would have been allowed to look at this and say, you paid $15,000. We awarded $94,000 more. Why did they do that? What didn't they consider? Was it reasonable for that position? And my argument is that that's something the jury should have been allowed to do, not the court. Counsel, did you want to reserve some time for your rebuttal? Yes, I do. Thank you, Your Honor. You bet. We'll hear from opposing counsel, please. Thank you. May it please the court. A central, basically undisputed aspect of the record of this case, critical to both Casper's appeal and Atlantic's cross appeal, is that throughout the adjustment of the claim, up to the date the lawsuit was filed, and even through a year of discovery, Casper never contended and never disclosed a claim that the business personal property had not been properly cleaned by resolution. Judge Bennett asked about the referral of an appraiser by Atlantic. It was a remediation company. Yes, I misspoke. If I said that, I beg your pardon. There were three suggestions, right? I think I misspoke, Judge Kristen. Yes. Oh, okay, good. We'll let you take that one. But there were three choices. Well, it's because appraisers become involved later in the case. But at that point, it was a remediation company. So Casper had a... I have a follow-up question about that. Forgive me. I have a follow-up question about that, because it seems that there were three choices. And I'm trying to figure out whether or not Casper knew from the outset that it was choosing someone or an entity resolution that was both going to assess and then do the follow-up planning after they had sorted it into salvageable and non-salvageable. Was that disclosed to Casper? Yes. Casper knew that they had a choice. And indeed, the record through, I believe, the deposition of Mr. Moser and the deposition say confirmed that Casper actually rejected one of those companies because they had had a problem with that company in the past about another matter having to do with vandalism in the neighborhood before this fire ever occurred. Mr. Bell, I don't think we're not communicating. My question's different. Okay. They're arguing that they didn't... They're arguing a conflict of interest because resolution was both going to sort these items into salvageable and non-salvageable piles, if you will, and then have the contract to do the cleaning for what was deemed salvageable. So they had an interest. That's the implied argument, right? They had an interest to deem more of it salvageable than was reasonable. And I'm trying to figure out whether they knew the resolution was going to serve both roles. Well, the contract itself, which is one of the exhibits, plainly states that, and this was signed by Ms. Musse on behalf of Casper. The contract itself says, we're being hired to pack out the contents, inspect them, and clean them. And that was true of the other choices as well, other than resolution? The other nominees? I would understand from the evidence, your honor, that Mr. Stey did not get that far in the process with either other company. He met with the representative of resolution, decided to go with him, and did not see a contract from the other two choices. So the order that you believe the evidence is, is the contract laid this out, he signed the contract, and his objections came after their number, not when he saw the contract that they were going to do both. His objections came after he saw the, after, well, there were, at the time of the motions and summary judgment, what was, well, no, there was a dispute as to when he signed the contract. According to resolution, he's, they would not have done any work without a signed contract. And so the evidence coming from resolution was, he signed it before they did any work, including the packout. According to Mr. Stey, he contended, when I took his deposition, that he did not see that contract and signed it until the packout had already occurred. So there was that dispute in the evidence between resolution and Mr. Stey. But again, throughout the, you know, throughout the course of the whole claim, before the lawsuit was filed, even through a year of litigation, Casper never came forward and said, we think, we contend that resolution did not properly clean what they took out of the store. Their contention was always, Casper, that their resolution should never have attempted to clean anything. And they objected to anything being included in a salvageable list to be, to be calculated on that basis. That was the contention. And that was as confirmed by Mr. Mosher, as confirmed by Mr. Stey during that period of time. And it wasn't. So the claim that you knew about was the claim that none of it was properly cleaned? No, that none of it could be properly cleaned. Right. And indeed there had, there was testimony from Mr. Mosher that he had met with Mr. Stey at an inspection at resolution. Right. And Mr. Stey didn't raise any issue about the contents not being cleaned. And Mr. Mosher testified that indeed at that inspection, he found that the contents had been cleaned. And so Atlantic's understanding through this whole process was their position was you simply can't clean these contents for a retail operation. There's a stigma on all these contexts by reason of being there. So Atlantic, you've got to pay for all of them as non salvageable. And there's no cleaning process permitted. That was the dispute. And so, and we get to the point that the complaint is filed. And if the court looks at the complaint, all but a line or two of the complaint, all that has to do with is the structural claim and not the property. This lawsuit started on the basis that they were complaining about how Atlantic paid for the structural claims. We get a year into the litigation, and then we start finding out that the real heart of this battle is they're complaining about they weren't properly paid for the business personal property. And it's not until I take the deposition of Mr. Stey in February of 2019, where the year after this lawsuit is filed, that I find out one, they have the property. And two, at the end of that month, on the eve of the close of discovery, they now contend a new that the property had not been cleaned properly by resolution. So we submit that's central to both. Because the court found that the real dispute here was between resolution and the insured. And resolution was the company hired by the insured to do the packout and the cleaning. And as the court properly found it was undisputed, that was revealed to Atlantic during the claim process. The court found that indeed, because of that dispute, the insured hired Brown & Haber. Brown & Haber submitted an additional report that was different than resolutions. Atlantic said, we find no basis to reject what your remediation company did, because this is a public adjuster disputing it. And so since the insured continued to press the point and said, we want to submit this to appraisal, that's when appraisers were involved. And Atlantic said, all right, we agree to submit this to appraisal. And that occurred approximately March through May of 2019. Do you want to talk about your... March through May of 2017. Do you want to talk about your motion in limine and the abuse of discretion? My question is, so you're taken by surprise on February 5th, 2019 during this deposition, there's still 24 days left before discovery closes. Why don't you do something at the deposition or within those 24 days to explore these issues, ask for more documents, request production of documents, file further interrogatories, because your complaint seems to be you're taken by surprise then. Then you get on the very last day of discovery, something from Casper and you can't do anything because discovery is over, but you had at least 24 days to do something. Two reasons, your honor. One, bear in mind that the MIDP rules that we were operating in the district court in Arizona at that time had been adopted in 2017. And Judge Campbell had been very clear in his pre-trial orders and in the extensions that he granted extending discovery that we had to come, that there had to be a basis for any extensions and he was opposed to extending discovery. He had already extended it twice. So we had that from Judge Campbell. But when you say that you were surprised by totally new evidence, a totally new theory, even if you said this order and this alternative discovery plan in Arizona was very rigid, wouldn't you be in a better position to make your argument to us today if you had at least asked, if you had at least asked to reopen discovery, asked to extend discovery, rather than just saying this, this order is so rigid, we wouldn't even ask the question. In hindsight, I would agree. I probably, we would probably be in a better position. But in 2019, as this was unfolding, we had Judge Campbell's rulings. Bear in mind, the February 4 deposition in this will say, provided merely the evidence. He was in possession of the property. It did not provide evidence that they now contended that it had to be improperly cleaned. That contention was not added to this lawsuit until February 28, the day of discovery closing. We then deposed Mr. DeLuise several days later and take it up with Judge Campbell at that time about these late disclosures and Judge I did so at that time, thinking about the motions for summary judgment we plan to file. And Judge Campbell made it very clear, he was not going to allow into evidence, late disclosed evidence. And looking at the standards and considering the standards of rule 26, rule 37, and the MIDP rules, we made the decision, all right, we will just, we'll go ahead and file our motion for summary judgment and proceed on the basis that they can't use this Is that in part of the transcript where he said, I'm not going to reopen or whatever he said, but you can raise it again at trial? We brought it up in reply in support of the motion for summary judgment because the response to the motion for summary judgment tried to incorporate the Scott DeLuise opinions about his inspection in late February of 2019. We objected to and pointed out the discussion we had with Judge Campbell. What he did with that, well, what we did is we asked, we moved to strike it and we moved for sanctions. And Judge Campbell ruled that because he ruled in favor of summary judgment, he denied the motion to strike as also contrary to, as unnecessary and contrary to rule seven and left it that way. Um, so, uh, we, we felt coming out of the motion, we understood coming out of the motion for summary judgment, that evidence wasn't being considered. Uh, we get a change of judge, uh, going from Judge Campbell to Judge Teelbert for the, for the trial, um, knowing that Judge Teelbert is in news of the case, I filed the motion limiting and our contention is Judge Teelbert makes no findings as required by rule 37, that there was any just reason for their delay in these disclosures. And so it doesn't shift to us to prove harmlessness or prejudice before they make that show. And Judge Teelbert did not require that of all, even though there is prejudice from the standpoint that had they timely disclosed this evidence at the time the suit was filed, we would have had more than a year to inspect it, to determine whether additional inspections, uh, were provided or needed as opposed to me scrambling to do that. Uh, after, uh, the discovery deadline had passed and asking Judge Campbell to extend discovery. Uh, and what, what happens if we were to agree with you, it was an abuse of discretion. What happens in the district court next on this issue? We would submit that the, the judgment from the trial is overturned. The case is returned for trial on the basis that that evidence is, it can't come into a new trial unless the trial judge finds that, uh, Casper had good cause not to disclose it at the time of their initial disclosure. Um, um, despite the fact that they had it in their possession. Okay. Well, we are talking about Casper. You're taking issue with the fact that Casper didn't disclose that Casper was in possession of Casper's property. Correct. You're right. I mean, they, this was, was something that was supposedly unusable. Um, uh, you know, their contention was they, they, they couldn't sell it. They couldn't do anything with it. They, they file a lawsuit again, a lawsuit. Does that mean you assume that they had thrown it away or that they declared it a total loss or that they, uh, the part, the part that's difficult for me is that you're contending that you didn't have noticed that they had their own property after this fire, but of course they have their own property. Well, I'm well, it being commercial property, uh, that can be disposed of in any number of ways. Uh, we understood it was appropriate to, to proceed on the basis that they're not disclosing. They have it. They're not disclosing that there's any defect in his condition at, in his, in their possession. And again, their whole lawsuit when filed is a lawsuit about the structural claim, not the property claim. It gets a two line reference and their initial disclosures are not here's what's wrong with the property. It's here's what they contend about what's wrong with how we handled the structural claim. And it's not until much later in the case, uh, that they, they begin to develop evidence. And this is at the time of mediation. Maybe I'm missing something here, but after it was cleaned, where did you think it was? The property that was cleaned. It remained in resolution's possession until, uh, late in 2017 when, uh, Mr. Say went in and took it from resolution after he finished a dispute with resolution in terms of paying for storing it. Uh, we, we understood that Mr. Say took it sometime in 2017. And at the time they filed a lawsuit and throughout, again, in February of 18, 2018 and new disclosures, nothing is said about it. So you, you assumed that it was just gone. We assumed it was gone. Uh, it had been disposed of as a part of a salvage on a, on a, uh, you know, a post fire claim. Um, they did with, you know, and, and, and again, they were making allegations about it other than then that somehow Atlantic didn't properly pay for it. But again, we understood what this, you know, the dispute that had been submitted to appraisal had been, and we understood we were defending a claim on the basis that here was an issue about whether a property could be cleaned or not. And did you submit an interrogatory to them? Um, where's the property? What happened to it? We did not. We, we pursued that at Mr. Say's deposition, but prior to his deposition, we did not because again, the, you know, the, the, the disclosure rules that we're working under in Arizona at the time were considered, you know, much more expanded and detailed, uh, in terms of the information that had to be turned over to the other side. So we would have expected, and we did expect identification of whatever evidence they had, and they didn't include, uh, the, the property as quote evidence they had. So there was an affirmative obligation under those disclosure rules that doesn't otherwise exist under the federal rules. Uh, we, we, that's correct. That, that we understood the MIDP rules adopted similar to the Arizona rules that you have to provide not only evidence for yourself that supports your case, but evidence that's favorable to the defense, anything that's relevant you are required to disclose. So, uh, you mentioned two lines in the complaint. I just want to, are you referring to paragraph five of the complaint? Which explains that the, uh, I think it would be paragraph six of the complaint, forgive me. That a fire occurred causing significant damage to the structure as well as to the goods, inventory, furniture, and other personal property used in connection. So there's notice there. Are there other lines in the complaint? To my understanding. That you're referring to? No, that, that they're, they're not saying, well, I think that there is reference to the, uh, later. Yes. All right. Thank you. Um, we've taken you significantly over your time. Counsel, would you like to use a rebuttal? Yes, I would, Your Honor. I think it's pretty, it's important to note that, you know, at last counsel admitted that since day one, they knew that, uh, we contested that the property could not be cleaned. Now, if I had gone off and recommended to my client to go off and destroy that property, we would be sitting here today, Your Honor, on a motion of, or as a, you know, a, uh, under spoliation that we destroy the evidence. Just to make good use of our time. What he said is that what the claim that your client gave notice of was that the property couldn't be cleaned because of a stigma is what he said. Is what's the earliest time you gave notice that the, that your position was that the proper had not been adequately cleaned, please. The notice of that in the complaint run under the paragraph he noted, Your Honor. And it was also through the entire entirety of the, uh, of the litigation. As far as the order that, uh, he's referring to from judge Campbell, there is no order from judge Campbell, uh, on discovery on any of these items here. Um, it seems to be somewhat of a, uh, an interpretation council has that judge Campbell was going to order this. Judge Campbell never ordered that any of this material would not be allowed into the case. And I think the most telling thing is to understand how judge Spielberg, uh, addressed this is reading the conversation between judge Spielberg, the testimony, uh, both during the motion limiting as well as during the trials, which is, did you do anything to find out about it? You knew the case was all, it was contesting whether or not the stuff had been properly cleaned. What did you do? Am I missing something? Okay. So the court, I think there's a good record to understand exactly how judge Spielberg would have looked at this. Judge Spielberg made a decision. We're talking about a senior district court judge and his decisions on the admission of evidence or on discovery, I think are well, uh, are well supported by the record. And I don't think it's the role here to usurp, uh, judge Spielberg's discretion as a trial court judge to make that decision. And with that, let me ask you this question. Let's assume for the moment that everything you just said is reasonable and not an abuse of discretion. What about the decision? Once he allowed your testimony on what the other side is characterized as a new theory. What about the trial judge's decision? Not even to let them have a rebuttal witness to come in and rebut the testimony that they say they were prejudiced by. Well, the issue then gets back to any level of disclosure. The fact that he went out there, they could have gone off and disclosed his opinions even before trial. The other thing they could have done is gone to judge Spielberg and said, during the motion will you allow us to go off and do an inspection and disclose this evidence? But I thought they proffered a witness that they wanted to put on the stand as a rebuttal witness. And the judge said, no, you can't do that either. I think we're talking about just to be clear, so I can follow this. I think we're talking about Mosher was on the stand and rebuttal, and there was an objection when he, or the question had to do with going out to, I think, um, see the property in the, in the pawn shop. Is that what you're referring to now, counsel, in response to judge Friedman's question? I just want to be clear. I believe both judge Friedman and I are talking about that question. And the issue was the inspection was done, but then Mr. Mosher didn't disclose any of his opinions before trial. So what you have is exactly, you know, even a more significant argument than, you know, than counsel presenting, which is there is no disclosure. There was no prior disclosure, Mr. Mosher's opinions. There was no way for us to prepare for trial. But he's a rebuttal witness. The first judge said, I'm denying your motion and eliminate, but you can raise it again at trial. The new judge, you raise it again at trial. He says, sorry, you lose again, he says to Atlantic. So he lets you go forward and put on your witnesses. And then Atlantic says, well, we've got Mr. Mosher here. And in addition to everything else he was going to testify about, he can, he's prepared to rebut what you allowed over our objection the other day, even though the earlier trial judge suggested that it might, you, you, it might be, uh, not be admitted. It was admitted. And now we, we have a right to, to rebut it with something. Well, the correction I would make your honor is judge Kielberg was the judge for the motion and limiting as well as the trial. So it was judge Kielberg who gave the initial ruling on the motions limiting and judge Kielberg who made the decision to trial. So he has the basis of both the arguments of the motion limiting as well as the trial situation to make his decision about what evidence he felt should be allowed in. Do either of my colleagues have additional questions? All right. Thank you both for your arguments. Counsel will take this matter under advisement and move on to the last case on our calendar for the day. Thank you, your honor.
judges: Christen, Friedman, Bennett